IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **RICKIE L. SHAMBAUGH,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil No. 11-976-CJP** |
| ) | |
| **MICHAEL J. ASTRUE**, ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Rickie L. Shambaugh is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) Benefits.[1]

**Procedural History**

Mr. Shambaugh applied for DIB in January, 2009, and SSI in May, 2010, alleging disability beginning on September 1, 2007. (Tr. 76, 137). The application was denied initially and on reconsideration. After holding a hearing, ALJ Norman L. Bennett issued a partially favorable decision dated September 9, 2010. ALJ Bennett found that plaintiff was not disabled before July 1, 2009, but that he became disabled as of that date. (Tr. 21-30). Plaintiff's request for review was denied by the Appeals Council, and the decision of the ALJ became the final agency decision. (Tr. 1).

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 23.

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

Plaintiff filed a Motion for Summary Judgment at Doc. 14.

## Issues Raised by Plaintiff

Plaintiff argues that the ALJ erred in the following respects:

1. The credibility determination was legally insufficient.

2. The ALJ failed to consider evidence indicating that he suffered from dizziness, including the report of a consultative examiner, Dr. Jensen, and treating nurse practitioner, Jocelyn Delarosa.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

---

[2]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

However, limitations arising from alcoholism or drug use are excluded from consideration of whether a claimant is disabled. **42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535.**

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported

by substantial evidence and that no mistakes of law were made.   The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Mr. Shambaugh was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).

This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Bennett followed the five-step analytical framework described above.  He determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date.  He determined that, from the alleged onset date of September 1, 2007,  Mr. Shambaugh had severe impairments of asthma, Meniere's disease and obesity.  Beginning on July 1, 2009, he had an additional severe impairment, degenerative disc disease of the lumbar spine.  The ALJ determined that, both before and after July 1, 2009, plaintiff's impairments did

not meet or equal a listed impairment.

The ALJ found that, prior to July 1, 2009, Mr. Shambaugh had the residual functional capacity to perform a limited range of work at the light exertional level. Based on evidence from a vocational expert, the ALJ found that plaintiff did not have the capacity to perform his past relevant work. However, he was able to do other work such as mail clerk, produce sorter and cashier. However, as of July 1, 2009, he had the RFC to do only a limited range of sedentary work, and he was disabled according to the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff, focused on the relevant time period of September 1, 2007, through July 1, 2009. As plaintiff's arguments relate only to his physical impairments, the Court will not discuss the mental health records.

1.      **Agency Forms**

Mr. Shambaugh was born in March, 1955, and was 52 years old when he allegedly became disabled. (Tr. 174). He was insured for DIB through December 31, 2011. (Tr. 141).

In a Disability Report dated February 14, 2009, plaintiff repeatedly stated that dizziness interfered with his daily activities. He said that bending over caused dizziness, and, when he was dizzy, he could not do anything. He said that he had fallen several times and had been taken from work in an ambulance after he fell and hit his head on concrete while getting a drink of water. (Tr. 151-162).

In another report, plaintiff said that he was unable to work due to dizziness, and that he

had stopped working on September 1, 2007, because of his condition. (Tr. 166).

He also indicated that he was getting worse since around January 10, 2008. He was having more dizzy spells. (Tr. 192). He said that he had no insurance and no money to pay for a doctor, and there was no free clinic where he lived. At the time, he lived in the state of Washington (Tr. 196, 198). Plaintiff moved to Illinois in late 2009. (Tr. 199).

Plaintiff had worked as a welder, forklift operator, material handler and receiving clerk. (Tr. 180).

**2.    Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing on August 25, 2010. (Tr. 40).

Mr. Shambaugh testified that he was 6 feet tall and weighed 264 pounds. He graduated from high school. (Tr. 45-46). He last worked in September, 2007. He said that he "got real sick, with the dizzy spells, and I was off a week , and they wouldn't let me come back." (Tr. 46).

Plaintiff testified that he had an operation on the back of his ear in 2006 to treat his Meniere's disease. Following the operation, his dizzy spells "got lighter" and did not come as often, but he still had them. (Tr. 50).

The rest of the testimony related to plaintiff's condition as of the time of the hearing, and was not directed to the period from September, 2007, through July, 2009.

**4.    Medical Records**

In October, 2006, Mr. Shambaugh underwent surgery for placement of an endolymphatic shunt to treat his Meniere's disease.[3] This was done at the University of Iowa Hospital. The

---

[3]"Meniere's disease is a disorder of the inner ear which causes spells of vertigo, fluctuating hearing loss, tinnitus (noises) and fullness in the ear. . . . The endolymphatic shunt procedure is a

medical records indicate that he had a history of Meniere's disease which had not been responsive to medical therapy. (Tr. 253).

Plaintiff was seen at IWIRC on September 10, 2007, for treatment of a work-related injury to his back. He was working as a laborer for Sedona Staffing. The injury occurred on September 6, 2007. He indicated that "he had been sealing bags, 100 bags to a box and bags weighed about 22 pounds apiece and he had to bend over to place the bags in a sealer." He sealed about 16 boxes, and experienced pain in his back and right rib area. He was seen three times in September, 2007, and was released to return to work with no restrictions as of September 19, 2007. These records do not reflect any complaints of dizziness. (Tr. 453-455).

In March, 2008, Dr. Robert Ayers examined plaintiff for a DOT physical. Dr. Ayers wrote that Mr. Shambaugh had a history of Meniere's disease with placement of an endolymphatic shunt in 2006. Plaintiff told him that he had hearing loss on the right side, but had "improved with his dizziness." The doctor went on to address "several issues that are concerning." These issues involved a potential cardiac problem and depression, but not dizziness. (Tr. 472-473).

Dr. Ray Jensen performed a consultative examination of plaintiff in connection with his application for social security disability benefits on February 23, 2009. (Tr. 275-278). Dr. Jensen practiced with a group of ear, nose and throat specialists in Washington State. He noted that Mr. Shambaugh was being evaluated for "disability related to chronic ear problems and

---

surgical procedure done from behind the ear through the mastoid bone. A small out pouching of the inner ear, the endolymphatic sac, is opened and a small drain tube is put in place. The idea of this operation is that any buildup of fluid of the endolymph will be relieved by this small tube." *Otolaryngology: Menieres Disease,* Washington University Physicians, http://wuphysicians.wustl.edu/dept.aspx?pageID=23&ID=8, accessed on July 23, 2012.

Meniere's disease." (Tr. 275). Mr. Shambaugh told him that he had ear pressure and ongoing chronic hearing loss in his right ear, along with frequent dizzy spells. He said that he had two or three episodes of vertigo a week, and that his episodes of vertigo had not changed significantly since the shunt was placed. He also indicated that he was "unable to work because of the frequency of the vertigo spells." His physical exam was essentially normal, except that Dr. Jensen noted that his gait "is somewhat deliberate but has normal base." Audiometric testing showed relatively flat but severe sensorineural hearing loss in the right ear and slight decreased high frequencies in the left ear. Speech discrimination was 60% in the right ear and 100% in the left ear. Dr. Jensen's impressions were history and physical findings consistent with Meniere's disease and bilateral "hearing loss with episodic vertigo contributing to difficulty in maintaining regular employment." (Tr. 275). Under "recommendations," Dr. Jensen noted that plaintiff would be getting the records from his treatment in Iowa, and would continue his medications as prescribed. He wrote, "His condition is likely chronic and will be a hindrance to being able to hold regular employment." He suggested consideration of further evaluation or treatment at a specialty center. (Tr. 276).

On May 19, 2009, Mr. Shambaugh was seen by advanced registered nurse practitioner (ARNP) Jocelyn Delarosa at an Urgent Care facility in Belfair, Washington. (Tr. 297-298). The note indicates that plaintiff had moved from California about a year prior. He gave a history of Meniere's disease with shunt placement. He had not taken any medication for Meniere's since he moved from California. He complained of "increased vertigo in the last month." He said he was having vertigo "at least greater than 4 times daily, especially when changing positions." He also complained of low back pain. (Tr. 298). On exam, ARNP Delarosa noted that the Dix-Hallpike maneuver was "difficult to perform due to the patient's severity of vertigo,

however, on peripheral and extraocular movement he presents with mild nystagmus on the right."[4] [5]

There are no further records reflecting complaints of dizziness or vertigo through July 1, 2009.

**5.    RFC Assessment**

On May 7, 2009, a state agency consultant, Dr. Utley, assessed plaintiff's RFC based upon a review of the records.  Dr. Utley reviewed Dr. Jensen's report of his examination, and noted that plaintiff had dizziness two to three times a week.  (Tr. 295).  Dr. Utley opined that plaintiff could do light work, limited to no climbing of ropes, ladders or scaffolds.  He should avoid concentered exposure to irritants such as fumes and odors, and avoid even moderate exposure to hazards such as machinery and heights.  (Tr. 288-292).

## Analysis

Plaintiff argues that the ALJ erred by failing to discuss evidence establishing the severity of his dizziness before July 1, 2009.

While the ALJ does not have to discuss every single piece of evidence, he is required to "build a logical bridge from evidence to conclusion."  ***Vilano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.**    This means that the ALJ cannot simply ignore a line of

---

[4]Dix-Hallpike maneuver is "a method for evaluating the function of the vestibule of the ear in patients with vertigo or hearing loss. The patient's position is quickly changed from sitting to lying down with the neck hyperextended, and then returned to sitting. Nystagmus can then be evaluated, and specific disorders of the vestibule may be diagnosed."
http://medical-dictionary.thefreedictionary.com/Dix-Hallpike+maneuver, accessed on July 24, 2012.

[5]Nystagmus refers to "fast, uncontrollable movements of the eyes."  One of the causes of nystagmus is Meniere's disease.  http://www.nlm.nih.gov/medlineplus/ency/article/003037.htm, accessed on July 24, 2012.

evidence that contradicts his conclusions. Rather, he must "confront evidence that does not support his conclusion and explain why it was rejected." ***Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).** Further, the ALJ may not selectively consider a doctor's report, ignoring the parts that conflict with his decision. ***Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)**; ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).**

ALJ Bennett failed to adequately discuss Dr. Jensen's report and explain the weight he gave it. The ALJ mentioned the report in two places. At Tr. 24, he noted the results of the audiometric testing done by Dr. Jensen. At Tr. 27, he said that Dr. Jensen noted deliberate gait, but also noted that plaintiff had a normal pace. ALJ Bennett never acknowledged that plaintiff told Dr. Jensen that he had dizzy spells two or three times a week and that his dizzy spells had not changed since the placement of the shunt. Further, the ALJ never discussed Dr. Jensen's opinion that plaintiff's hearing loss and episodic vertigo contributed to difficulty in maintaining regular employment, and that his condition is "likely chronic." (Tr. 275-276).

The Commissioner first argues that, since Dr. Jensen was not a treating doctor, the ALJ was not required to discuss his opinions. See, Doc. 20, p. 8. This is simply incorrect. 20 C.F.R. §404.1527(d) requires the ALJ to "evaluate every medical opinion" using a checklist of specified factors. Dr. Jensen was a consultative examiner, and not a treating doctor, so his opinion was not entitled to "controlling weight" under §404.1527(d)(2). Regardless, the ALJ was required to evaluate the opinion and to explain his reasons for accepting or rejecting it. ***Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009)**.

The Commissioner also asserts that Dr. Jensen's opinions are not "medical opinions," but are more in the nature of vocational opinions, which do not require discussion. 20 C.F.R. §1527(a)(2) defines medical opinions as statements that reflect judgments about "the nature and

severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." This argument does not carry the day. Plaintiff is arguing that the ALJ ignored evidence which tended to establish the severity of his dizziness prior to July 1, 2009. Dr. Jensen's opinion that his hearing loss and episodic vertigo were severe enough to contribute to difficulty in maintaining regular employment and were likely chronic were opinions about the severity of his impairments. Statements about the severity of impairments are medical opinions under §1527(a)(2). The Commissioner relies on a case from the Eighth Circuit, **Turley v. Sullivan, 939 F.2d 524, 527 (8th Cir. 1991)**, for the proposition that a treating doctor's opinion based on vocational factors is not entitled to deference. That case does not help the Commissioner's position at all; the doctor in *Turley* opined that the plaintiff's limited reading ability coupled with his physical condition would make it hard for him to find work. Limited reading ability is a vocational, not a medical, factor, but Dr. Jensen's opinions here were based on the severity of plaintiff's symptoms and not on any such vocational factor.

      The Commissioner also argues that Dr. Jensen's statements were tentative and he did not know enough about plaintiff's condition to assess what he was able to do. While that might have been a valid reason to discount Dr. Jensen's opinions, it was not a reason advanced by the ALJ, and so cannot be relied upon by the Commissioner to defend the decision. **McClesky v. Astrue, 606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision...."); Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010).**

      The ALJ also failed to note that, in May, 2009, ARNP Delarosa recorded that the severity of plaintiff's vertigo made it difficult to perform the Dix-Hallpike maneuver, but she was able to

ascertain that he had nystagmus on the right.  The ALJ mentioned in two places that Mr. Shambaugh's gait was steady when he was examined by ARNP Delarosa, without acknowledging her observation as to the severity of his vertigo.  See, Tr. 23; 26-27.

Taken together, the ALJ's selective handling of the evidence from Dr. Jensen and ARNP Delarosa was a failure of his duty to build the requisite logical bridge from the evidence to his conclusion.  **Vilano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.**  The ALJ's decision rested on the proposition that Mr. Shambaugh could still work until July 1, 2009, when his degenerative disc disease restricted him to sedentary work.  Plaintiff's main argument for why he could not work before July 1, 2009, was the severity of his dizziness.  Therefore, it was incumbent upon the ALJ to fairly consider all of the evidence regarding the severity of his dizziness before July 1, 2009.  He could not simply ignore the parts of the evidence that conflicted with his decision.  **Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000).**

The selective discussion of the medical evidence also affected the credibility determination.  ALJ Bennett expressed his negative credibility findings in the "boilerplate language" that has been repeatedly criticized by the Seventh Circuit.  See, e.g., **Parker v. Astrue, 597 F.3d 920, 921-922 (7th Cir. 2010)**;  **Brindisi v. Barnhart, 315 F.3d 783, 787-788 (7th Cir. 2003)**.  See, Tr. 26.

It is true, as the Commissioner argues, that the use of the boilerplate language is not necessarily fatal.  The mere use of the boilerplate does not require reversal where the ALJ supports his conclusion with reasons derived from the evidence.  **See, Richison v. Astrue, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012).**

Here, as the Commissioner himself notes, the ALJ based his credibility determination on a discussion of the medical evidence and on the fact that plaintiff said his dizziness improved

after his surgery and he was released to return after his surgery. See, Doc. 20, p. 7. The problem is, as discussed above, that the ALJ's discussion of the medical evidence omitted mention of evidence favorable to plaintiff's claim. "When evaluating credibility, the ALJ must 'consider the entire case record and give specific reasons for the weight given to the individual's statements.'" ***Shideler v. Astrue*, ___ F.3d ___, 2012 WL 2948539, *4 (7th Cir., 2012), citing *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009)**. Here, the ALJ's failure to consider evidence favorable to plaintiff means that his credibility determination cannot be upheld.

Because of the ALJ's errors, this case must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Shambaugh was disabled prior to July 1, 2009, or that he should be awarded benefits for that period. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's Motion for Summary Judgment **(Doc. 14)** is **GRANTED**. The Commissioner's final decision denying Rickie L. Shambaugh's application for social security disability benefits prior to July 1, 2009, is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED: July 25, 2012.**

                                          s/ Clifford J. Proud
                                          **CLIFFORD J. PROUD**
                                          **United States Magistrate Judge**